UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
TRANSATLANTIC AUTO GROUP, INC.,
et al.,

                Plaintiffs,                   **REPORT &**
                                          **RECOMMENDATION**

   - against -

                                       08 CV 5070 (DLI)

UNITRANS-PRA CO., et al.,

                Defendants.
--------------------------------------------------------X

On December 16, 2008, plaintiffs Transatlantic Auto Group, Inc. ("Transatlantic"), Bobr

Export, Inc. ("Bobr"), Darg Trading, LLC ("Darg"), North American Service Enterprise, Inc.[1]

("N.A. Service"), and Sairhey Tomin, brought this action against defendants Unitrans-Pra Co.,

Inc. ("Unitrans"), FT&T Consulting, Inc. ("FT&T"), Vladimir Lysogorsky, Igor Cherkassky,

Simon Kaganov, Viktoriya Farber, Diamond Shipping Group, Inc. ("Diamond"), Mediterranean

Shipping Company (USA) Inc. ("Mediterranean"),[2] Maersk Line Limited ("Maersk"),[3] OOCL

(USA), Inc. ("OOCL"), and Zim American Integrated Shipping Services Company Inc. ("Zim"),[4]

seeking damages pursuant to the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 30701,

based on defendants' alleged breach of contracts to deliver certain goods from New York to

---

[1]On March 30, 2009, the parties entered into a stipulation dismissing the claims of N.A. Service and Sairhey Tomin against all defendants except OOCL, which was So Ordered by the district court on March 31, 2009. OOCL was thereafter dismissed from the action by Order dated April 10, 2009.

[2]On February 4, 2009, the action was discontinued as to defendant Mediterranean by stipulation and the caption was amended accordingly.

[3]On December 29, 2008, by Stipulation and Order, "A.P. Moller-Maersk A/S/D/B/A Maersk Line" ("Maersk") was substituted as a party defendant in place of Maersk Line Limited. On February 11, 2009, a stipulation discontinuing the action as to Maersk was filed and on March 27, 2009, the stipulation was So Ordered, dismissing the claims against Maersk.

[4]On March 5, 2009, the action was discontinued as to defendant Zim.

various ports overseas.

On January 30, 2009, defendants Unitrans, FT&T, Lysogorsky, Cherkassky, Kaganov, and Farber (collectively, the "Unitrans defendants"), filed their Answer to the Complaint, asserting Crossclaims against defendant Diamond and Counterclaims against Transatlantic. On February 10, 2009, the Unitrans defendants filed a Third Party Complaint against third party defendants Bronislav Futerman, Lev Shutsman, Aleksandr Kovalev, STS Group, Inc. ("STS Group"), and Alexandre Morozov, alleging that the third party defendants had conspired with plaintiffs and with Diamond to commit fraud on the Unitrans defendants through the use of false and fraudulent documents, in connection with the shipments referred to in the Complaint.

When the third party defendants, STS Group, Alexandre Morozov, and Bronislav Futerman failed to appear and respond to the Third Party Complaint, the Unitrans defendants filed motions for entry of default on July 23, 2009, and the Clerk of Court entered a default against STS Group and Morozov on September 15, 2009, and against Futerman on September 18, 2009. On March 4, 2010, the Unitrans defendants filed two separate motions for default judgment – one against third party defendants STS Group and Morozov and another against third party defendant Futerman and codefendant Diamond. On August 30, 2010, plaintiffs Transatlantic and Bobr filed a letter seeking a default judgment against Diamond.[5]

The motions for default judgment have been referred to the undersigned to conduct an inquest and prepare a Report and Recommendation as to damages.

---

[5]Both the Unitrans defendants and the plaintiffs have requested default judgment against Diamond. However, because of certain procedural issues, these requests are addressed separately. See discussion, infra at 35-45.

## FACTUAL BACKGROUND

I. Plaintiffs' Complaint

In the initial Complaint, plaintiffs allege that they were the owners of certain vehicles that they wished to export overseas. (Compl.[6] ¶ 19). During the summer of 2008, they contracted with defendant Diamond to arrange for the shipment of those cars. (Id. ¶¶ 19-20). Plaintiffs claim they delivered the cars to Diamond's warehouse in Carlstadt, New Jersey, along with "the original titles evidencing their respective ownership of the various vehicles." (Id. ¶¶ 21-22). Upon delivery of the cars and titles, plaintiffs, "in most cases," received a Shipping Instruction Form, indicating the name of the shipper, the name of the consignee, the itinerary of the shipment, and identifying details of the vehicle being shipped, including the Vehicle Identification Number ("VIN"), year, make, model, and declared value. (Id. ¶ 23). Also, "in most cases," plaintiffs received an invoice from Diamond and paid Diamond for the shipment of the vehicles "th[r]ough to their respective final destinations." (Id. ¶ 24). "Thereupon, Diamond was to process the original titles . . . appropriately package the Vehicles into Shipping Containers suitable for oceangoing transport, and arrange transportation overseas to the respective final destinations." (Id. ¶ 25).

Plaintiffs allege that, in all cases, Diamond procured the services of two related companies, defendants Unitrans, a non-vessel operating carrier, and FT&T, its related company, to export and arrange for the transportation of the vehicles. (Id. ¶ 26). "In most cases," Diamond asked plaintiffs to sign documents authorizing Unitrans to act as plaintiffs' agent. (Id. ¶ 27).

---

[6]Citations to "Compl." refer to the plaintiffs' original Complaint filed on December 16, 2008.

Specifically, plaintiffs signed "a form power of attorney . . . authorizing Unitrans to create, sign, and file Shipper's Export Declarations ("SED's"), as required by law." (Id.) Plaintiffs allege that Unitrans and FT&T acted as common carriers for the transport of all of plaintiffs' vehicles and delivered invoices to Diamond for charges relating to the oceangoing and non-oceangoing transport of plaintiffs' vehicles. (Id. ¶¶ 29-30). Plaintiffs further allege that, "in many cases," Unitrans and FT&T "delivered back to Diamond[] the Plaintiffs' respective original Title documents for their vehicles, which were in turn delivered to the respective Plaintiffs." (Id. ¶ 31).

Plaintiffs also claim that Unitrans and FT&T "arranged for the delivery of the Plaintiffs' Vehicles as packaged in containers to various Oceangoing common carriers," including former defendants Mediterranean, Maersk, OOCL, and Zim. (Id. ¶ 37). Unitrans and FT&T allegedly received Master Bills of Lading ("MBOLs") from these common carriers, and plaintiffs were allegedly the "intended beneficiaries" of the MBOLs, which all defendants knew. (Id. ¶¶ 38-40). Plaintiffs allege that Unitrans and FT&T retained possession, custody, and control of the MBOLs. (Id. ¶ 41).

Plaintiffs further claim that Unitrans and FT&T delivered to Diamond, as required by law, House Bills of Lading (the "House Bills" or "HBOLs") relating to the transportation of plaintiffs' vehicles. (Id. ¶¶ 32-33). Plaintiffs claim to be the "intended beneficiaries" of the HBOLs and that all defendants were aware that the plaintiffs were the intended beneficiaries. (Id. ¶ 34). Despite this, plaintiffs claim that, "in most cases," Diamond "failed and refused" to deliver the HBOLs to plaintiffs (id. ¶ 35), and "[i]n all cases" refused to deliver the reverse side of the HBOLs, which contained the terms and conditions. (Id. ¶ 36).

4

The crux of the plaintiffs' Complaint is that "prior to the time that any of the Vehicles reached their respective final ports of destination," Unitrans and FT&T, "acting together and in concert and in conspiracy with each other and together with" defendants Lysogorsky, Cherkassky, Kaganov, and Farber, "decided not to release any of the vehicles to the order of the Plaintiffs or their respective Consignees without receiving additional monies not contemplated" by the contracts for shipment. (Id. ¶¶ 43-44). Despite plaintiffs' demands that Unitrans and FT&T release the vehicles to either plaintiffs or their consignees, Unitrans, FT&T, and the individual defendants refused to do so. (Id. ¶¶ 45-46). Defendants apparently began to threaten plaintiffs "with unlawful restraint and/or destruction of their vehicles" and with "unlawful physical violence" unless additional monies not contemplated by the contracts for shipment were paid. (Id. ¶¶ 49-50).

Plaintiffs' first cause of action for Breach of Maritime Contracts alleges that Unitrans and FT&T breached their contracts with plaintiffs, damaging plaintiffs "in amounts not less than the contract values of their respective Vehicles, in the aggregate of more than $1.88 Million Dollars." (Id. ¶¶ 114-16). The second cause of action for conversion alleges that Unitrans and FT&T wrongfully converted plaintiffs' vehicles. (Id. ¶¶ 117-21). As a result, plaintiff Transatlantic claims damages "in an amount not less than the value of the Transatlantic Vehicles, in the aggregate of more than $164,000," and plaintiff Bobr claims damages "in the aggregate of more than $150,000." (Id. ¶¶ 119-21). The third cause of action is for replevin and alleges that each plaintiff is entitled to a judgment of replevin against various defendants. (Id. ¶¶ 122-27).

The fourth cause of action alleges that plaintiffs are entitled to injunctive relief, prohibiting defendants from releasing the vehicles to anyone other than plaintiffs or their

consignees and directing defendants to "advise, instruct, and importune their respective overseas agents and storage facilities not to sell, dismantle, or act in any way to assist or cause the sale, secretion or disposal of any of the Vehicles . . . ." (Id. ¶¶ 130-31). Plaintiffs also allege that they "are entitled to mandatory injunction[s] directing Defendants . . . to forthwith return to the Plaintiffs their respective Vehicles . . . and original titles therefor, if they be in actual possession, custody or control thereof," and if not, to direct anyone in control thereof to release them to plaintiffs' consignees. (Id. ¶ 132).

The fifth cause of action, which alleges tortious interference with contract, claims that the individual defendants had knowledge of the contracts between plaintiffs and defendants and, "by virtue of their intentional, malicious, willful, and unjustified acts and omissions, . . . procured Unitrans and FT&T to breach" their contracts with plaintiffs. (Id. ¶¶ 135-36). For this claim, plaintiffs seek the value of their vehicles, as well as punitive damages amounting to $1,000,000 from each defendant. (Id. ¶¶ 137-38).

The final cause of action seeks damages for Diamond's[7] alleged breach of its respective contracts with plaintiffs. Plaintiffs seek to recover damages in an amount "not less than the values of their respective Vehicles, in the aggregate of more than $1.88 Million Dollars." (Id. ¶ 142).

---

[7]All claims and crossclaims for which the parties seek a default judgment against Diamond are addressed separately, infra at 35-45. Furthermore, although third party defendants Futerman and "Shutsman" are listed as defendants on the docket sheet, this appears to be an error. Plaintiffs failed to include either person as a defendant in the original Complaint, filed on December 16, 2008, and no amended complaint exists that includes Futerman or "Shutsman" as defendants. The Court notes that although the docket sheet, Third Party Complaint, and Cross Claim Summons refer to the third party defendant as "Lev Shutsman," the defendant signed his Declaration for Inquest as "Lev Shatsman."

## II. The Third Party Action

The Third Party action filed by the Unitrans defendants alleges that third party defendants STS Group, Bronislav Futerman, Lev Shatsman, Alexandre Morozov, and Aleksandr Kovalev[8] conspired with plaintiffs to falsify documents and cause the issuance of multiple and conflicting title documents for the same vehicles with the intent to force the Unitrans defendants to settle claims by releasing cars for which freight and other charges had not been paid. (Third P. Compl.[9] ¶ 10(a)). In furtherance of this scheme, it is alleged that the third party defendants knowingly and fraudulently sold cars shipped by Unitrans to multiple buyers, creating adverse claims against Unitrans for the release of the cars. (Id. ¶ 10(c)). The Unitrans defendants contend that the impetus for this scheme was an increase in the Russian customs duties that made it uneconomical for plaintiffs' foreign customers to consummate the sale of the vehicles shipped by Unitrans. (Id. ¶ 10(d)). The Third Party Complaint alleges that the third party defendants contacted Diamond customers who received services from Unitrans and told the customers not to pay Unitrans the amounts owed as a way of pressuring Unitrans to release the cars without first receiving freight and other shipping charges. (Id. ¶ 10(b)).

Count 2 of the Third Party Complaint further alleges that Futerman, the general partner and officer and director of Diamond (id. ¶ 4), issued various checks to FT&T, totaling $205,564.50, only to thereafter call Unitrans to state that there were actually insufficient funds in the accounts to cover the checks. (Id. ¶¶ 12-13). When Unitrans attempted to cash some of the

---

[8]The Third Party claims against Shatsman and Kovalev were dismissed pursuant to the July 27, 2010 Stipulation and Order.

[9]Citations to "Third P. Compl." refer to the Third Party Complaint, filed on February 10, 2009.

checks, they were, in fact, dishonored by the bank. (Id. ¶ 13). FT&T therefore now seeks reimbursement from Futerman of the amounts owed from the dishonored checks. (Id. ¶ 14).

The Third Party Complaint further alleges that Unitrans entered into an Agreement with Diamond, in which Diamond agreed to use Unitrans exclusively for exporting automobiles from the United States. (Id. ¶ 15). Based on a liquidated damages provision contained in the Agreement, Futerman, as the general partner, shareholder, and officer and director of Diamond, is alleged to owe Unitrans $100 per container for each container shipped during the first year, but no less than $250,000, based on Diamond's failure to abide by the terms of the Agreement during the second year following the execution of the Agreement. (Id. ¶¶ 16-20). Liability against Futerman is premised on the basis that "Futerman used Diamond as an instrument for the commission of fraudulent and criminal acts . . . and failed to maintain the corporate proprieties required to maintain Diamond's separate corporate existence," making Futerman personally liable for all of Diamond's debts. (Id. ¶¶ 19-20).

The Third Party Complaint also seeks payment from Futerman in the amount of $1,900 for freight forwarding services rendered to Diamond (Count 4; Third P. Compl. ¶¶ 22-27); for the value of two Mitsubishi Montero sports cars that were lost or converted to Futerman's own use, in the sum of $14,000 (Count 5; Third P. Compl. ¶¶ 28-32); for $375, representing the costs of recovery of another vehicle lost or converted by Futerman (Count 6; Third P. Compl. ¶¶ 33-34); for indemnification (Count 7; Third P. Compl. ¶¶ 35-41); and for punitive damages in "an amount to be determined by the Court but not less than $1 million." (Count 8; Third P. Compl. ¶¶ 42-43). As for the claims alleged against STS Group and Morozov, the Third Party Complaint seeks the amount of $115,512 due in unpaid freight and other charges (Count 9; Third P. Compl.

8

¶¶ 44-48), and for reimbursement, "in the amount of $8,599 together with interest at the legal or agreed upon rate, whichever is higher," of a check made payable to FT&T that was dishonored by the bank. (Count 10; Third P. Compl. ¶¶ 49-51).

## PROCEDURAL HISTORY

After plaintiffs filed their Complaint on December 16, 2008, the district court issued an Order to Show Cause why the court should not enter a preliminary injunction, as requested by plaintiffs in their Complaint. The district court later granted the request for a temporary restraining order "preventing the sale or auction of vehicles shipped from the United States to various foreign ports using defendants' services." (Summ. Order[10] at 1). The district court Ordered that, "upon plaintiffs depositing the sum of $175,702 with the Clerk of the Court, or into an interest bearing escrow account," defendants would "immediately deliver to plaintiffs or their overseas agents all original title documents and Bills of Lading within their possession, custody or control, for all vehicles" identified by plaintiffs. (Id. at 2).[11]

Following the entries of default in September 2009, the Unitrans defendants filed motions for default judgment against third party defendants Morozov, STS Group, and Futerman, on March 4, 2010. While these motions were pending, this Court held a conference on July 16, 2010, at which time certain of the parties agreed to a partial settlement of their respective claims.

---

[10]Citations to "Summ. Order" refer to the Summary Order issued by the district court on December 24, 2008.

[11]In the Summary Order, the district court further Ordered that 9178-6103 Quebec, Inc. be deemed interpleaded as a party defendant. (Summ. Order at 3). Defendant Quebec, Inc. subsequently filed an Answer and Counterclaim against plaintiff Bobr on January 14, 2009. The counterclaim was dismissed in a stipulation filed with the Court on March 16, 2009.

On July 27, 2010, the parties entered into a Stipulation and Order in which it was agreed that: 1) plaintiffs' claims against defendants Unitrans, FT&T, Lysogorsky, Cherkassky, Kaganov, and Farber (the "settling defendants") would be dismissed with prejudice; 2) the counterclaims of the settling defendants against all plaintiffs except for Darg would be dismissed with prejudice; 3) on the counterclaims filed against plaintiff Darg, defendants Unitrans and FT&T would receive $32,300 without prejudgment interest; 4) the third party claims of the settling defendants against Shatsman and Kovalev would be dismissed with prejudice; and 5) all remaining crossclaims and counterclaims were referred to the undersigned to hold inquests as needed.

This Stipulation was So Ordered by the district court on July 28, 2010. The Unitrans defendants now seek default judgment against third party defendant Futerman and against third party defendants STS Group and Morozov.

On August 31, 2010, this Court held an inquest hearing on the default motions, at which the Unitrans defendants presented the testimony of two witnesses – Vladimir Lysogorsky, president of FT&T Company and vice president of Unitrans (Tr.[12] at 15), and Viktoriya Farber, who performs "compliance work for FT&T." (Farber Decl.[13] ¶ 1). Upon consideration of the testimony of the witnesses and the papers submitted in connection with the inquest, the Court respectfully recommends that third party defendant Futerman be held liable to third party plaintiff Unitrans in the amount of $219,939.50 and that STS Group and Morozov be held jointly and severally liable to third party plaintiff Unitrans in the amount of $91,771.

---

[12]Citations to "Tr." refer to the transcript of the inquest hearing held before this Court on August 31, 2010.

[13]Citations to "Farber Decl." refer to the Declaration of Viktoriya Farber, dated September 2, 2010.

I. Default Judgment

A. Legal Standard

Rule 55(a) of the Federal Rules of Civil Procedure provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default." Fed. R. Civ. P. 55(a). Rule 55 sets forth a two-step process for an entry of default judgment. See Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95-96 (2d Cir. 1993). First, the Clerk of the Court automatically enters the default pursuant to Rule 55(a) by notation of the party's default on the clerk's record of the case. See id. Second, after the Clerk of the Court enters default against a party, if that party fails to appear or otherwise move to set aside the default pursuant to Rule 55(c), the court may enter default judgment. See Fed. R. Civ. P. 55(b).

In determining whether to enter a default judgment, the Second Circuit has cautioned that since a default judgment is an extreme remedy, it should only be entered as a last resort. See Meehan v. Snow, 652 F.2d 274, 277 (2d Cir. 1981). While the Second Circuit has recognized the "push on a trial court to dispose of cases that, in disregard of the rules, are not processed expeditiously [and] . . . delay and clog its calendar," it has held that the district court must balance that interest with its responsibility to "[afford] litigants a reasonable chance to be heard." Enron Oil Corp. v. Diakuhara, 10 F.3d at 95-96. Thus, in light of the "oft-stated preference for resolving disputes on the merits," default judgments are "generally disfavored" and doubts should be resolved in favor of the defaulting party. Id. Accordingly, simply because a party is in default, the plaintiff is not entitled to a default judgment as a matter of right. See Erwin

11

DeMarino Trucking Co. v. Jackson, 838 F. Supp. 160, 162 (S.D.N.Y. 1993) (noting that courts must "supervise default judgments with extreme care to avoid miscarriages of justice").

The Court has significant discretion to consider a number of factors in deciding whether to grant a default judgment, including: 1) whether the grounds for default are clearly established; 2) whether the claims were sufficiently pleaded in the Complaint thereby placing the defendant on notice, see Fed. R. Civ. P. 54(c) (stating: "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings"); King v. STL Consulting LLC, No. 05 CV 2719, 2006 WL 3335115, at *4-5 (E.D.N.Y. Oct. 3, 2006) (holding that Rule 54(c) is not violated in awarding damages that accrued during the pendency of a litigation, so long as the complaint put the defendant on notice that the plaintiff may seek such damages); and 3) the amount of money potentially involved – the more money involved, the less justification for entering the default judgment. See Hirsch v. Innovation Int'l, Inc., No. 91 CV 4130, 1992 WL 316143, at *2 (S.D.N.Y. Oct. 19, 1992). In addition to considering whether material issues of fact remain, the Court may consider whether the facts alleged in the complaint state a valid cause of action, whether plaintiff has been substantially prejudiced by the delay involved, and whether the default judgment might have a harsh effect on the defendant. See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981).

"[W]hen a default is entered, all well-pleaded factual allegations in the complaint are accepted as true." Greater N.Y. Nursing Home Div. of 1199/SEIU Greater N.Y. Benefit Fund v. Verrazano Staffing, Inc., No. 05 CV 4116, 2007 WL 148077, at *2 (E.D.N.Y. Mar. 28, 2007). The court must still determine, based on the well-pleaded facts in the complaint, whether the allegations state a claim upon which relief can be granted. Au Bon Pain Corp. v. Artect, Inc.,

653 F.2d at 65 (holding that "a district court has discretion under Rule 55(b)(2) once a default is determined to require proof of necessary facts and need not agree that the alleged facts constitute a valid cause of action"); see also Garden City Boxing Club, Inc. v. Giambra, No. 02 CV 839S, 2004 WL 1698633, *1 (W.D.N.Y. July 27, 2004) (holding that "[p]rior to entering default judgment, the court must determine whether the facts alleged in the Complaint are sufficient to state a claim for relief as to each cause of action").

In reviewing the sufficiency of the Complaint, Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), so that defendants have "fair notice of what the claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). To satisfy this standard, a complaint must allege "enough facts to state a claim that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

B. The Unitrans Defendants' Claims Against Futerman

The Unitrans defendants seek a default judgment against third party defendant Futerman on Counts 2 through 6 of the Third Party Complaint. (Diamond/Futerman Default Judg.[14] at 4-5;

---

[14]Citations to "Diamond/Futerman Default Judg." refer to Unitrans' Partial Default Judgment in Favor of Defendants, Unitrans-Pra Co. and FT&T Consulting, Inc. Against: (1) Codefendant, Diamond Shipping Group, Inc.; and (2) Third Party Defendant, Bronislav Futerman, filed March 4, 2010.

Diamond/Futerman De May Decl.[15] ¶¶ 7(a)-(e)). The Court notes that in the Declaration of

Stephen H. Vengrow, Esq., filed in support of defendants' Inquest on Cross Claims and Third

Party Claims against Diamond and Futerman, the Unitrans defendants assert that they are seeking

damages for Counts 1 through 7 of the Third Party Complaint against Futerman, "claims for

which a default judgment is sought." (Diamond/Futerman Vengrow Decl.[16] ¶ 4). However,

neither their Motion for Default Judgment nor the Declaration of Joseph De May, Esq., filed with

and in support of that Motion, mention Counts 1 or 7. Rather, these two documents both assert

that defendants are seeking to recover damages from Futerman on Third Party Complaint Counts

3, 4, 2, 5, and 6, listed in that order. (Diamond/Futerman Default Judg. at 4-5;

Diamond/Futerman De May Decl. ¶ 7). The De May Declaration also explicitly asserts that

"[t]his application is for judgment by default on some but not all of the crossclaims and third

party claims pleaded respectively against defendant, Diamond Shipping Group, Inc., and third

party defendant, Bronislav Futerman." (Diamond/Futerman De May Decl. ¶ 2). The Motion also

notes that the alleged basis for joint liability between Futerman and Diamond is that _five_ of the

crossclaims against Diamond overlap with _five_ of the claims against Futerman.

(Diamond/Futerman Default Judg. ¶ 5). Furthermore, the De May Declaration concludes by

requesting "[d]efault judgment on the crossclaims and third party claims identified above."

---

[15]Citations to "Diamond/Futerman De May Decl." refer to Unitrans' Declaration of Joseph De May, Jr., filed in support of their Partial Default Judgment in Favor of Defendants, Unitrans-Pra Co. and FT&T Consulting, Inc. Against: (1) Codefendant, Diamond Shipping Group, Inc.; and (2) Third Party Defendant, Bronislav Futerman on March 4, 2010.

[16]Citations to "Diamond/Futerman Vengrow Decl." refer to Unitrans' Attorney's Declaration of Stephen H. Vengrow, filed in support of their Partial Default Judgment in Favor of Defendants, Unitrans-Pra Co. and FT&T Consulting, Inc. Against: (1) Codefendant, Diamond Shipping Group, Inc.; and (2) Third Party Defendant, Bronislav Futerman on August 30, 2010.

(Diamond/Futerman De May Decl. ¶ B).

Based on all of these assertions, Futerman cannot possibly have received notice that the Unitrans defendants were seeking default and damages on any of the claims in the Third Party Complaint aside from 2 through 6. As such, the Court declines to recommend an award of a default judgment or damages on Counts 1 or 7 at this time and therefore has not analyzed those claims any further. Accordingly, the Court addresses Counts 2 through 6. The Court addresses Counts 3 and 4 last due to the specific concerns they raise.

### 1) Count 2 of the Third Party Complaint

Count 2 of the Third Party Complaint alleges that during 2008, Futerman delivered to FT&T various checks in amounts totaling $205,564.50. (Third P. Compl. ¶ 12). Futerman later called Unitrans to tell them not to cash the checks, as there were insufficient funds to cover the checks. (Id. ¶ 13). When Unitrans attempted to cash some of those checks, they were dishonored. (Id.) Accordingly, the Unitrans defendants seek to recover the amounts owed pursuant to these dishonored checks. (Id. ¶ 14).

In support of this claim, Mr. Lysogorsky identified a number of checks from Diamond, signed by Futerman. (Tr. at 15-16; Ex. A). Attached to each check was one or more invoices with the names "FT&T Consulting Co., Inc." and "Unitrans-Pra" on the top, which Mr. Lysogorsky testified were the form of invoices issued by FT&T to its customers. (Tr. at 15-16; Ex. A). These invoices were issued to Diamond in the ordinary course of business and signed by

15

Futerman. (Tr. at 17; Corrected Lysogorsky Decl.[17] ¶ 3, Ex. A). The invoices covered by the

checks at issue range in time from June 8, 2008 through August 6, 2008. (Tr. at 26). In his

Declaration, Mr. Lysogorsky explained that he recognized Futerman's signature because FT&T

had dealt with Futerman in the course of FT&T's duties "for several years." (Corrected

Lysogorsky Decl. ¶ 3).

According to Ms. Farber's testimony, Diamond was moving a large number of vehicles

through Unitrans. (Tr. at 25). She testified that they would come to the office on a daily basis

and present certain checks, some of which she was told to deposit. (Id.) With respect to others,

she was told that she should hold some of the checks until she was told she could deposit them

because "[t]here [wa]s not enough funds to cover all the checks." (Id.)

She explained that the reason Unitrans continued to move Diamond's vehicles was that

Diamond did not stop paying completely; it would make partial payments on some of the checks.

(Id. at 26). Ms. Farber testified that when the amount due reached $205,000, defendants decided

to stop dealing with Diamond. (Id.) Ms. Farber explained that the uncashed checks correspond

to the invoices for cars that were moved by Unitrans prior to the other cars listed in Schedules A

or B and that the cars were released by Unitrans on a promise that Unitrans could cash the checks

eventually. (Id. at 26-27).

It appears that Unitrans attempted to cash some, but not all, of the checks that they

received from Futerman. With respect to the dishonored checks, New York has implemented

Article 3 of the Uniform Commercial Code, which regulates commercial paper. The U.C.C.

---

[17]Citations to "Corrected Lysogorsky Decl." refer to Unitrans' Declaration of Vladimir Lysogorsky, dated August 30, 2010, and submitted on September 2, 2010.

defines a check as "a draft . . . payable on demand and drawn on a bank," that is signed by the

drawer, payable on demand at a definite time, payable to order or to bearer, and contains an

unconditional promise to pay a sum certain and no other promise. U.C.C. § 3-104(a), (f). The

drawer engages that if a "draft is dishonored, the drawer is obliged to pay the draft," and that this

"obligation is owed to a person entitled to enforce the draft or to an indorser who paid the draft

under Section 3-415." U.C.C. § 3-414(b). To recover under this section, plaintiffs must merely

show "[d]efendant's making of the instrument and failure to make payment," at which point

"[t]he burden of proof then shift[s] to defendant to establish a defense to his obligations on the

note." Chamberlain v. Amato, 259 A.D.2d 1048, 1049, 688 N.Y.S.2d 345, 346 (4th Dep't 1999)

(citing U.C.C. § 3-413)).

With respect to the checks that Unitrans received from Futerman, but never attempted to

cash for fear that they would be dishonored, Futerman still owes a contractual obligation to pay

the amounts indicated in the checks. Therefore, having reviewed the invoices and considered the

testimony of the witnesses, the Court respectfully recommends that a default judgment be entered

against Futerman for Count 2 of the Third Party Complaint. It is further recommended that the

Unitrans defendants be awarded damages in the amount of $205,564.50, which represents the

total amount of the unpaid or dishonored checks.

### 2) Count 5 of the Third Party Complaint

The Third Party Complaint alleges that on or about August 31, 2007, Futerman, as the

general partner, shareholder, officer and director of Diamond, entered into an agreement whereby

Diamond agreed to use Unitrans exclusively for the export shipment of automobiles from the

United States (the "Exclusivity Agreement"). (Third P. Compl. ¶ 15). In Count 5, the Unitrans

defendants allege that between February 6, 2008 and February 20, 2008, two Mitsubishi Montero

sports cars were delivered to Diamond, pursuant to the Exclusivity Agreement, so that Diamond

could then provide loading, trucking, and other services. (Id. ¶ 29). The VIN numbers on the

vehicles are identified as: 1) VIN # JA4MT31H2YP009700, for a car valued at $6,525, and 2)

VIN # JA4MT21H11P050255, for a car valued at $7,475. (Id.) The Unitrans defendants allege

that these two vehicles were either lost due to Futerman's negligence or were converted by

Futerman for his own use. (Id. ¶ 30). As agent and trustee for those who have an interest in

these cars, the Unitrans defendants seek a total of $14,000 from Diamond and Futerman jointly,

representing the value of these vehicles. (Id. ¶ 31-32).

In seeking to hold Futerman responsible for damages for breach of contract and

fraudulent acts by Diamond, the Third Party Complaint alleges that Futerman, as the general

partner, shareholder, officer and director of Diamond, "used Diamond as an instrument for the

commission of fraudulent and criminal acts" and "failed to maintain the corporate proprieties

required to maintain Diamond's separate corporate existence," making Futerman personally

liable for all of Diamond's debts. (Id. ¶¶ 18-20). In determining whether a principal or owner of

a corporation may be held liable for the corporation's actions, courts have held that "[i]n

appropriate circumstances, the distinction between the entity and its owner 'may be disregarded'

to require an owner to answer for the entity's debts." NetJets Aviation, Inc. v LHC Comm's,

LLC, 537 F.3d 168, 177 (2d Cir. 2008) (citing Pauley Petroleum Inc. v. Continental Oil Co., 239

A.2d 629, 633 (Del. 1968)). New York law allows a piercing of the corporate veil "either upon a

showing of fraud or upon complete control by the dominating corporation [or individual

18

shareholder] that leads to a wrong against third parties." <u>Wm Passalacqua Builders, Inc. v. Resnick Developers South, Inc.</u>, 933 F.2d 131, 138 (2d Cir. 1991) (citing <u>American Protein Corp. v. AB Volvo</u>, 844 F.2d 56, 59 (2d Cir. 1988)). "When a corporation is used by an individual to accomplish his own and not the corporation's business, such a controlling shareholder may be held liable for the corporation's commercial dealings as well as for negligent acts." <u>Id.</u> "Control . . . is the key; the control must be used to commit a fraud or other wrong that causes plaintiff's loss." <u>Id.</u>

"[C]ourts [may] look to a variety of factors, including the intermingling of corporate and personal funds, undercapitalization of the corporation, failure to observe corporate formalities such as the maintenance of separate books and records, failure to pay dividends, insolvency at the time of a transaction, siphoning off of funds by the dominant shareholder, and the inactivity of other officers and directors." <u>Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.</u>, 98 F.3d 13, 18 (2d Cir. 1996). However, "there is no mechanical rule as to how many and to what degree the factors . . . must be present to pierce the corporate veil." <u>Id.</u> Here, the Court finds that the allegations in the Third Party Complaint are sufficient to pierce the corporate veil and hold Futerman liable for the damages caused by the breach of contract by Diamond.

Based on the documentation presented in connection with the inquest proceeding and the undisputed allegations in the Third Party Complaint, the Court respectfully recommends that a default judgment be entered against Futerman for Count 5 of the Third Party Complaint and that the Unitrans defendants be reimbursed by Futerman in the amount of $14,000.

### 3) Count 6 of the Third Party Complaint

In Count 6 of the Third Party Complaint, the Unitrans defendants seek to recover $375 in costs incurred to recover another vehicle – a Toyota Highlander, VIN # JTEHF21A610040746 – which Unitrans claims was lost or converted by Futerman after it was delivered to Diamond on February 2, 2008 for loading and trucking. (Id. ¶ 34). Unitrans eventually recovered the vehicle on December 22, 2008, having expended $375 in doing so. (Id. ¶¶ 34-35).

Based on the documentation presented in connection with the inquest proceeding, the Court respectfully recommends that a default judgment be entered against Futerman for Count 6 of the Third Party Complaint and that the Unitrans defendants be awarded $375 for recovery costs relating to this vehicle.

### 4) Counts 3 and 4 of the Third Party Complaint

In Count 3 of the Third Party Complaint, the Unitrans defendants allege that Futerman, as the general partner, shareholder, officer and director of Diamond, breached the Exclusivity Agreement by failing to comply with the provision which required Diamond to use Unitrans exclusively for the export shipment of automobiles from the United States. (Third P. Compl. ¶ 15). In the event of such a breach, the Exclusivity Agreement provides for liquidated damages in the amount of $100 per container shipped in the preceding year, but no less than $250,000, to be paid to the Unitrans defendants. (Diamond/Futerman Vengrow Decl., Ex. B). The Unitrans defendants allege that Diamond ceased using Unitrans' services after the first year of the Agreement, breaching the Exclusivity Agreement. (Third P. Compl. ¶ 17).

In support of that claimed breach, Unitrans submitted 19 dock receipts that show that

Diamond was using another freight forwarder in place of Unitrans. (Corrected Lysogorsky Decl. ¶ 7(a); Diamond/Futerman Vengrow Decl., Ex. G). According to Ms. Farber, Unitrans obtained these 19 dock receipts from a trucking company that was used by both Unitrans and the other freight forwarder, Sotby. (Tr. at 32). Specifically, in her testimony, Ms. Farber identified the 19 dock receipts for 19 separate containers that were loaded between October 30, 2008 and November 6, 2008, which she claims fell within the second year of the Exclusivity Agreement. (Id. at 30). The top of each receipt states "Diamond Shipping Group." (Tr. at 31; Diamond/Futerman Vengrow Decl., Ex. G). However, Ms. Farber testified that because the name "Unitrans" does not appear anywhere on the dock receipts, it is clear that these dock receipts are not Unitrans' dock receipts. (Tr. at 30). Furthermore, according to Ms. Farber, the "container numbers" on these 19 dock receipts also indicate that they were not shipped by Unitrans. (Id. at 30-31). She explained that the first four letters in the container number indicate that the container is "shipper owned." (Id. at 31). Ms. Farber testified that "SOBU," the first four letters in the container numbers for the majority of the 19 dock receipts, stands for Sotby, another freight forwarder. (Id. at 30-31; Diamond/Futerman Vengrow Decl., Ex. G). Accordingly, as a consequence of Diamond's breach, the Unitrans defendants seek liquidated damages in the amount of $250,000, in accordance with the terms of the Agreement. (Third P. Compl. ¶ 17).

In Count 4 of the Third Party Complaint, the Unitrans defendants seek damages from Futerman for services rendered and uncompensated. (Third P. Compl. ¶¶ 23-24). The Exclusivity Agreement provides that Diamond would pay Unitrans $100 per container for their freight forwarding services. (Diamond/Futerman Vengrow Decl., Ex. B; Third P. Compl. ¶ 23).

In Count 4, the Unitrans defendants allege that they rendered services for 19 containers and never received payment from Diamond for those services. (Third P. Compl. ¶ 24-25). Thus, they claim they are owed $1,900 from Futerman. (Id. ¶ 24).

In support of this claim, the Unitrans defendants submitted Exhibit C, which is a spreadsheet that purportedly lists the 19 shipments, solely identified by container number. (Third P. Compl., Ex. C). A comparison of the 19 container numbers listed in Exhibit C, submitted in support of Count 4, with the 19 dock receipts submitted as Exhibit G, in support of Count 3, shows that the container numbers are identical. Thus, it appears as though the Unitrans defendants are seeking $100 per container for services rendered on the same 19 shipments for which they are seeking liquidated damages based on the claim that these same containers were actually shipped by Sotby instead of by Unitrans as required under the Exclusivity Agreement. At best, the use of the same container numbers for both Counts is a serious error by defendants and/or their counsel; at worst, it suggests fraud upon the Court. In the Third Party Complaint, the Unitrans defendants claim that they rendered freight forwarding services on these particular 19 shipments, while Ms. Farber was adamant that the dock receipts for those same 19 shipments indicate that Diamond was using another freight forwarder, in breach of the Exclusivity Agreement. Thus, the Court finds these representations impossible to reconcile.

Given the inconsistencies in the Unitrans defendants' support for these two counts, this Court finds that the Unitrans defendants have failed to satisfy their burden to prove damages and accordingly, respectfully recommends that the relief sought in Counts 3 and 4 be denied.

C. The Unitrans Defendants' Claims Against STS Group and Morozov

The Unitrans defendants seek default judgment against third party defendants STS Group, Inc. and Alexandre Morozov. As with the claims against Futerman, the Unitrans defendants have requested damages in their inquest papers on claims against STS Group and Morozov for which they never sought default judgment. In the Declaration of Stephen Vengrow, filed in Support of their Inquest on Third Party Claims for third party defendants STS Group and Morozov, the Unitrans defendants seek damages for Counts 1, 9, and 10 of the Third Party Complaint. (STS/Morozov Vengrow Decl.[18] ¶¶ 4, 8-14). However, the Motion for Default Judgment against STS Group and Morozov, as well as the supporting Declaration of Joseph De May, Esq., only seek to recover damages for Counts 9 and 10. (STS/Morozov Mot. Default Judg.[19] at 3; STS/Morozov De May Decl.[20] ¶ 7). As with the claims against Futerman, the De May Declaration includes language explicitly limiting the default motion to the claims listed in the Declaration. (STS/Morozov De May Decl. ¶ A (requesting "[d]efault judgment on the third party claims identified above")). Accordingly, the Court has not recommended an award based on Count 1, but proceeds to consider damages based solely on Counts 9 and 10.

---

[18]Citations to "STS/Morozov Vengrow Decl." refer to Unitrans' Attorney's Declaration of Stephen H. Vengrow filed in support of their Motion for Partial Default Judgment Against Third Party Defendants, Alexandre Morozov and STS Group, Inc. on August 30, 2010.

[19]Citations to "STS/Morozov Default Judg." refer to Unitrans' Motion for Partial Default Judgment in Favor of Defendants, Unitrans-Pra Co. and FT&T Consulting, Inc. Against Third Party Defendants, Alexandre Morozov and STS Group, Inc., filed March 4, 2010.

[20]Citations to "STS/Morozov De May Decl." refer to Unitrans' Declaration of Joseph De May, Jr., filed in support of their Motion for Partial Default Judgment Against Third Party Defendants, Alexandre Morozov and STS Group, Inc. on March 4, 2010.

1) <u>Count 9</u>

Count 9 of the Third Party Complaint alleges that "[t]here is now due and owing to Unitrans from the said third party defendants [STS and Morozov], the sum of $115,512.00 in unpaid freight and other charges . . . no part of which has been paid although duly demanded," and "with interest at the legal or agreed upon rate, whichever is higher." (Third P. Compl. ¶¶ 46, 48). Count 9 further alleges that Morozov is personally liable "based upon fraud and piercing the corporate veil in that Morozov has used the STS Group Inc. corporation to fraudulently and without authorization sell the same automobiles to more than one buyer each of whom claimed rights adverse to the others." (<u>Id.</u> ¶ 47). The Unitrans defendants allege that they submitted invoices to STS Group, "which has accepted them without objection, as a result of which there is an account stated between the parties for the principal amount of the invoces [sic] together with interest at the legal or agreed upon rate, whichever is higher." (<u>Id.</u> ¶ 48). Copies of the invoices were provided in Exhibit D.


a) <u>Liability</u>

To establish a breach of contract claim in New York, a party must establish the following: "(1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach." <u>Prince of Peace Enter., Inc. v. Top Quality Food Mkt., LLC</u>, No. 07 CV 349, 2011 WL 118245 at *9 (S.D.N.Y. Jan. 12, 2011) (quoting <u>RCN Telecom Servs., Inc. v. 202 Centre St. Realty LLC</u>, 156 Fed. Appx. 349, 350-51 (2d Cir. 2005)). In order to prove fraud in New York, the Complaint must show by clear and convincing evidence that the defendant knowingly or recklessly misrepresented a

material fact, intending to induce the plaintiff's reliance, and that the plaintiff relied on the misrepresentation and suffered damages as a result. Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc., 500 F. 3d 171, 181 (2d Cir. 2007) (citing Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2006)).

As with Futerman, the Court may disregard the corporate form when the necessary elements are demonstrated in accordance with the holding in Wm Passalacqua Builders, Inc. v Resnick Developers South, Inc., 933 F. 2d at 138. See also NetJets Aviation, Inc. v LHC Comm's, LLC, 537 F.3d at 177 (citing Pauley Petroleum Inc. v. Continental Oil Co., 239 A.2d at 633). Here, the allegations of the Third Party Complaint are sufficient to establish that, at the time of the transaction, Mr. Morozov exercised such control over the company that it was merely an instrumentality of Morozov, the real actor. Moreover, the undisputed allegations sufficiently allege that such control was used to commit fraud or other wrong, causing harm to the Unitrans defendants. See Wm Passalacqua Builders, Inc. v Resnick Developers South, Inc., 933 F. 2d at 138 (citing Lowendahl v. Baltimore & Ohio R.R. Co., 247 A.D. 144, 287 N.Y.S. 62).

Based on the undisputed allegations in the Third Party Complaint, the Court finds that the Unitrans defendants have stated a claim for breach of contract against STS Group and that they have alleged facts sufficient to warrant holding Mr. Morozov liable in his capacity as the alter ego of STS Group.


b) Damages

In seeking damages from STS Group and Morozov on Count 9 for unpaid freight and other charges, the Unitrans defendants submitted the Declarations of Ms. Farber and Mr.

Lysogorsky, along with supporting documentation. According to Ms. Farber's Declaration, STS

Group tendered a check to FT&T, dated November 11, 2008, as payment of monies contributed

by FT&T pursuant to joint purchase agreements entered into between STS Group and FT&T, as

well as to cover freight and other charges relating to the movement of 5 cars to their destination.

(Farber Decl. ¶ 3; STS/Morozov Vengrow Decl., Ex. K). This check, in the amount of

$135,157,[21] was payment owed to FT&T for the purchase and movement of these 5 cars that

were not listed in Schedules A and B of the December 8, 2008 Summary Order. (Farber Decl. ¶

2; STS/Morozov Vengrow Decl., Ex. K).

In his Declaration, Mr. Lysogorsky identified this check as having been signed by

Morozov, whose signature Lysogorsky recognized because FT&T, "in the course of its duties for

Unitrans, had dealt with Morozov and his company, STS for several years." (Corrected

Lysogorsky Decl. ¶ 7[22]). Mr. Lysogorsky also identified Exhibit L, as another check issued by

STS Group for $8,599, representing a payment for a number of invoices. (Tr. at 22-23;

STS/Morozov Vengrow Decl., Ex. L). According to Mr. Lysogorsky, this second check, Exhibit

L, was also signed by Morozov but when presented for payment, the check was dishonored.

(Corrected Lysogorsky Decl. ¶ 8). Mr. Lysogorsky explained that no attempt was ever made to

cash the $135,157.00 check submitted as Exhibit K because the previously received check,

---

[21]The Court notes that in her Declaration, Ms. Farber consistently misstates the amount of
the uncashed check submitted as part of Exhibit K. Although the check actually submitted as
Exhibit K is for the amount of $135,157.00, in her Declaration, Ms. Farber often states that the
check is in the amount of $135,172.00. The mistake does not, however, affect the calculations of
damages.

[22]The Court notes that this paragraph number 7 is misnumbered in the Corrected
Declaration. This paragraph 7 refers to the second paragraph 7, the one which follows
paragraphs 7(a)-(d).

Exhibit L, had been dishonored. (Id.) Therefore, Unitrans assumed that Exhibit K would be dishonored as well. (Id.) Accordingly, the Unitrans defendants contend that because the check was never cashed, STS Group and Morozov still owe them for these 5 cars.

However, as Ms. Farber explained, the $135,157 that was due for the movement of these cars was later adjusted to reflect the payment of $52,000 made by Quebec, Inc. "for freight and other charges to obtain the release of some of these 5 cars at destination." (Farber Decl. ¶ 3). This payment is reflected in an invoice issued to STS Group dated November 13, 2008. (Id., K.1). In addition to noting the reduction in amount owed due to this Quebec payment, the invoice also reflects an addition of $15.00, representing a bank charge for the dishonored check. (Id.) When the $52,000 is subtracted from the $135,157, and then $15.00 is added to the remainder, the total still owed for these 5 cars is $83,172.00. (Farber Decl., Ex. K.1).

In addition to the November 13, 2008 invoice, the Unitrans defendants sent a second billing statement to STS Group, dated February 2009 (the "Statement"). (Farber Decl., Ex. K.2; Id. ¶ 4). The Statement lists not only the invoice for the $83,172.00 owed, but includes 10 other invoices for monies owed for "freight and other charges in respect to cars identified in Schedules A and B." (Farber Decl. ¶ 4). According to Ms. Farber, this Statement – Exhibit K.2 – sets forth a total amount owed of $115,512.00, itemized in accordance with 11 transactions for which payment had not been tendered. (Id., Ex. K.2). "[T]he settlement agreement in the main litigation satisfied payment" of 10 of the 11 transactions in an amount totaling $32,340.00,[23] leaving only the unpaid invoice for $83,172.00. (Id.)

---

[23]Although the actual settlement figure was $32,300.00, the Unitrans documents refer to it as $32,340.00.

Based on the testimony of Mr. Lysogorsky and Ms. Farber, which has not been challenged, and based on a review of the supporting documentation, the Court respectfully recommends that the Unitrans defendants be awarded $83,172.00, from STS Group and Morozov, jointly and severally.[24]

### 2) Count 10

Count 10 of the Third Party Complaint alleges that "[o]n or about October 28, 2009, for good and sufficient consideration, third party defendants, STS Group Inc. and Alexandre Morozov, duly drew and delivered to third party plaintiff, FT&T, a check, no. 1059, for $8,599." (Third P. Compl. ¶ 50). As confirmed by Mr. Lysorgorsky in his testimony, that check – Exhibit L– "was subsequently dishonored by the bank, as a result of which third party plaintiff, FT&T has been damaged in the amount of $8,599, together with interest at the legal or agreed upon rate, whichever is higher." (Id. ¶ 51; Tr. at 22-23; Corrected Lysogorsky Decl. ¶ 8).

### a) Liability

As explained above, New York has implemented Article 3 of the Uniform Commercial Code, which regulates commercial paper. Therefore, in order to recover for this claim, plaintiffs must merely show "[d]efendant's making of the instrument and failure to make payment," at which point "[t]he burden of proof then shift[s] to defendant to establish a defense to his

---

[24]In addition to the $83,172 remaining after accounting for the amounts paid by Quebec, the Unitrans defendants also seek interest based on the supporting invoices which call for interest at the rate of 1.5% per month for late payments. (Corrected STS/Morozov Vengrow Decl. ¶¶ 8-10). Thus, Unitrans seeks $83,172 plus interest of $26,947.73 accrued up through September 3, 2010. (Id.) The Unitrans defendants' request for interest is addressed separately for all claims. See infra at 30-35.

obligations on the note." Chamberlain v. Amato, 259 A.D.2d at 1049, 688 N.Y.S.2d at 346 (citing U.C.C. § 3-413)).

Here, Count 10 of the Third Party Complaint alleges that STS Group and Morozov "duly drew and delivered . . . a check . . . for $8,599." (Third P. Compl. ¶ 50). Count 10 also alleges that the check was dishonored by the bank, and therefore FT&T was damaged in an amount equal to the check. (Id. ¶ 51). As part of their documentation in support of their claims for damages, the Unitrans defendants submitted a copy of both sides of the check which was allegedly dishonored. (STS/Morozov Vengrow Decl., Ex. L). The front of the check is stamped with "Return Reason–A Not Sufficient Funds." The check, dated "10/28/08," is made out to FT&T for $8,599, and contains the following numbers in the "For" line: 13072, 13403, 13840, 14419, 14430, 14831, and 15064. (Id.) These numbers appear to correspond to invoices issued by FT&T and billed to STS Group. (Id.)

Plaintiffs have alleged the necessary elements to state a claim on a dishonored check. Based upon the allegations, which the Court accepts as true, and the exhibits submitted to the Court, the Court respectfully recommends that default judgment be granted as to Count 10 of the Third Party Complaint.


### b) Damages

In seeking damages for this dishonored check, the Unitrans defendants presented Mr. Lysogorsky's testimony identifying the signature on the check as that of Morozov. (Tr. at 22; STS/Morozov Vengrow Decl., Ex. L).

Based on a review of the testimony and the supporting documentation, the Court

29

respectfully recommends that the Unitrans defendants be awarded $8,599 from STS Group and Morozov, jointly and severally.

### D. Interest

As a general matter, the Unitrans defendants have requested an award of interest allegedly accrued for various claims against STS Group, Morozov, and Futerman. However, as set forth in more detail below, the methods used for calculating the requested interest appear to change in the various motion papers, and the basis for some of these interest calculations is unclear. For these reasons, the Court respectfully recommends that interest not be awarded at this time, subject to a further submission by defendants.

### 1. Counts Asserted Against STS and Morozov

In both Counts 9 and 10 of the Third Party Complaint, the Unitrans defendants generally request "interest at the legal or agreed upon rate, whichever is higher." (Third P. Compl. ¶¶ 48, 51). In their Motion for Default Judgment, they specifically request 0.62% interest on each of the two Counts[25] (STS/Morozov Default Judg. at 3), which the Declaration of Joseph De May, Esq. explains as follows:

> The prejudgment interest rates requested in the default judgment are computed by taking the arithmetic average of the yearly rates for U.S. Treasury Constant Maturities for (a) the date from which

---

[25]Specifically, the Motion for Default Judgment requests: "$115,512.00 on Third Party Complaint Count 9 with interest at 0.62% from December 31, 2008 amounting to $837.83," and "$8,599.00 on Third Party Complaint Count 10 with interest at 0.62% from October 28, 2008 amounting to $71.72." (STS/Morozov Default Judg. at 3). No end date has been provided for these calculations in any of the documents submitted. Without an end date, the Court cannot verify that Unitrans' interest calculations are correct.

prejudgment interest is claimed (.37 % and .39% respectively) and (b) the last date appearing the March 1, 2010 release [sic] (.86%) at:

> http://www.federalreserve.gov/Releases/H15/

(STS/Morozov De May Decl. ¶ 9).

In their subsequently filed inquest papers, however, the Unitrans defendants do not mention interest in connection with Count 9. (See STS/Morozov Vengrow Decl. ¶¶ 8-11). They do request interest in connection with Count 10, but instead of the formula set forth in the De May Declaration, the Unitrans defendants now assert that "the supporting invoices call for interest at the rate of 1.5% per month on late payments,"[26] allegedly amounting to $2,921.78 owed through September 3, 2010. (Id. ¶ 12). Finally, the supplemental or Corrected Vengrow Declaration requests 1.5% per month in interest for both Count 9 and Count 10. (Corrected STS/Morozov Vengrow Decl.[27] ¶¶ 10, 12). Neither of these requests for interest seem to rely on the formula set forth in the De May Declaration, nor does Mr. De May mention the 1.5% interest rate provided for in the invoices. Thus, in their most recently filed requests, it appears that defendants have calculated simple interest through September 3, 2010 for Count 9 and through August 31, 2010 for Count 10, using the 1.5%, and requesting $26,947.73 and $2,909.05, respectively, for the two Counts. (Id.)

During the inquest hearing, Mr. Vengrow addressed the amount of interest being sought

---

[26]The invoices attached to the Vengrow Declaration as Exhibit L do, in fact, include a note which states: "We reserve the right to make a Finance Charge of 1.5% per month of [sic] the higher rate permitted by law on all amounts past due and add all collection fees." (STS Morozov Vengrow Decl., Ex. L).

[27]Citations to "Corrected STS/Morozov Vengrow Decl." refer to Unitrans' Attorney's Declaration of Stephen H. Vengrow [Corrected] filed in support of their Inquest Against Third Party Defendants on September 2, 2010.

from Morozov and the STS Group based on the $83,172 owed following the settlement and on the dishonored check for $8,599. (Tr. at 11-12). Again, without further explanation as to the change in methodology, counsel simply indicates that "in that invoice you'll see in the lower, left-hand corner there's a finance charge of 1.5 percent. We left it out of our papers, but that interest calculates to $26,947.73," presumably on Count 9. (Id. at 12-13). Nowhere in any of their papers or during the inquest have defendants explained the vast differences in the amount of interest requested in the De May Declaration and the subsequently filed Corrected Vengrow Declaration.

### 2. Counts Asserted Against Futerman

Defendants also seek interest on Counts 2 through 6 of the Third Party Complaint against Futerman, but unlike the Counts alleged against STS and Morozov, Counts 2 through 6 of the Third Party Complaint make no mention of interest.[28] (Third P. Compl. ¶¶ 12-34). In their Motion for Default Judgment against Futerman, the Unitrans defendants request an award of interest calculated using the 1.5% rate, as follows: 1) $5,640.41 in interest on Count 3, representing interest accrued at a rate of 1.5% from August 31, 2008;[29] 2) $42.87 in interest on Count 4, also at a rate of 1.5% from August 31, 2008; 3) $1,442.89 in interest on Count 2,

---

[28]Despite the fact that the Court has recommended not entering default with respect to Counts 3 and 4 in light of the inconsistencies in the Unitrans defendants' filings, the Court includes a discussion of the Unitrans defendants' requests regarding interest on those two claims to ensure that, in the event default is entered on those claims, defendants will clarify their interest calculations.

[29]Apart from the other issues discussed herein, at oral argument, Mr. Vengrow seemed to suggest that they were not requesting interest on Count 3: "there's no interest on that – everything is liquidated damages." (Tr. at 11).

32

representing interest from December 31, 2008, accruing at a rate of 0.60%; 4) $426.33 in interest

on Count 5, at a rate of 1.5% from February 20, 2008; and 5) $2.69 in interest, representing

interest from December 22, 2008 accrued at a rate of 0.39%, for Count 6, for a total of $7,555.19

in requested prejudgment interest.[30] (Diamond/Futerman Default Judg. at 4-5). Similar to the

explanation provided for the interest rates by De May in his STS/Morozov Declaration, De

May's earlier filed Declaration in support of the Motion for Default Judgment against Futerman

states that:

> The prejudgment interest rates requested in the default judgment
> are computed by taking the arithmetic average of the yearly rates
> for U.S. Treasury Constant Maturities for (a) the date from which
> prejudgment interest is claimed and (b) the last date appearing the
> March 1, 2010 release [sic] at:
> http://www.federalreserve.gov/Releases/H15/

(Diamond/Futerman De May Decl. ¶ 9). However, unlike the statement in the STS/Morozov

version, no interest percentage values were provided for the averages used for the Futerman

Counts.

Then, in their inquest papers, the Unitrans defendants, in their discussion of Count 2

relating to the $205,564.50 of dishonored checks, indicate, as they did for STS/Morozov, that

"[t]he invoices included in Exhibit A contain a provision for payment of interest. The printed

language beneath the description box provides for interest on late amounts at 1.5% per month."

(Diamond/Futerman Vengrow Decl. ¶ 11). They claim that "[c]alculating simple interest from

the date of the last invoice up to and including September 3, 2010, the date of the inquest hearing

herein, Unitrans is entitled to prejudgment interest of $76,943.09." (Id.) This amount is more

---

[30]As with the requests for interest made in the STS/Morozov Motion, no end dates have
been provided for any of these calculations.

than ten times the $7,555.19 amount previously requested in their Motion for Default Judgment, filed just six months earlier.[31] However, no explanation has provided for this extraordinary increase or for why the Counts for which they had previously requested interest rates of 0.39% or 0.60% , would now qualify for the 1.5% rate.

Furthermore, the entire discussion of interest with respect to the Futerman claims is contained in the section of the Vengrow Declaration that addresses Count 2; the other sections of the Vengrow Declaration that deal with Counts 3, 5, and 6 do not reference interest, let alone the rates of interest requested for each Count. (Id. ¶¶ 13-20). Lastly, although the Vengrow Declaration states that damages are sought for Counts 1 through 7, there is no section that is dedicated to or even mentions Count 4, let alone requests interest for Count 4.

During the inquest hearing, Mr. Vengrow stated as follows with respect to the issue of interest owed from Futerman on Count 2: "obviously, we would want interest and the interest is really a finance charge of 1.5 percent, not compounded, simple interest multiplied from the last date of the invoice, which you will see in Exhibit A." (Tr. at 9). According to Ms. Farber, she took the latest invoice and calculated interest at 1.5% from that date until September 3, 2010. (Id. at 9-10).

With respect to the claim against Futerman for $250,000 in liquidated damages based on the breach of the Exclusivity Agreement set forth in Count 3, Mr. Vengrow stated at the hearing: "There's no interest on that. Everything is liquidated damages." (Id. at 11). That statement suggests that the Unitrans defendants are not seeking interest on the $250,000 sought on Count 3.

---

[31]The Vengrow Declaration is dated August 30, 2010; the Motion for Default Judgment is dated March 3, 2010.

The question of interest also does not appear to have been addressed at the hearing in connection with Counts 4 or 5.[32]

As should be quite clear from this illustration, there are a number of inconsistencies in the papers submitted by the Unitrans defendants insofar as they relate to any request for interest on amounts owed by STS, Morozov, or Futerman. More importantly, they have provided no explanation for the change in rates and methodology used to calculate interest between the time De May filed his Declaration in connection with the Motion for Default Judgment and the inquest. The Court therefore declines to recommend that interest be awarded on any of the claims at this time. The Court instead respectfully recommends that defendants' requests for interest on the awarded damages be denied without prejudice to renew their application once these inconsistencies have been explained.

## ALLEGED DEFAULT BY DIAMOND

### I. Unitrans Defendants' Claims Against Diamond

On January 30, 2009, the Unitrans defendants filed their Answer to the plaintiffs' Complaint, asserting Crossclaims against their co-defendant, Diamond. Having scrupulously reviewed the docket sheet and the documents provided to the Court, it is unclear whether the Answer with Crossclaims was ever actually served upon defendant Diamond. Two copies of a July 30, 2009 Affidavit of Service were filed by the Unitrans defendants, on August 17, 2009[33]

---

[32]Although counsel raised the issue of the $14,000 owed for the two cars that were the subject of Count 5, there does not appear to have been a discussion of interest.

[33]In their Motion for Default Judgment against Diamond and Futerman, the Unitrans defendants cite to the docket entry for this August 17, 2009 Affidavit of Service as indicating that "the crossclaim summons and crossclaims of defendants and third party plaintiffs" had been

and September 14, 2010. The one Affidavit of Service, sworn to on August 12, 2009, indicates

that on July 30, 2009, the process server served the N.Y.S. Secretary of State with the

"Crossclaim Summons; Third Party Complaint of Defendant and Third Party Plaintiff, Unitrans-

Pra Co. on Diamond Shipping Group, Inc." A second Affidavit of Service, filed on August 17,

2009, was also sworn to on August 5, 2009, and indicates that copies of these same documents

were mailed to Diamond. Neither of these affidavits list the "Answer to Complaint, Crossclaim

against Diamond Shipping Group, Inc., Counterclaim," which was filed on January 30, 2009, as

being attached. Moreover, the Crossclaim Summons itself explicitly states that: "Copies of

plaintiffs' Complaint and Third Party Complaint are also attached; again, there is nothing in the

Crossclaim Summons that indicates that the Answer with Crossclaims and Counterclaim is

attached. By contrast, in serving the Third Party Compliant, defendants not only reference the

"attached third party complaint" in the Third Party Summons, but the Affidavits of Service

explicitly list the "3rd Party Complaint" as being served. Similarly, the September 14, 2010

Affidavit is identical to one of the Affidavits filed on August 17, 2009. Both of these Affidavits

indicate service upon Diamond of the Third Party Complaint, which does not name Diamond as

a third party defendant nor does it assert claims against Diamond.

Even if the Answer with Crossclaims was properly served upon Diamond, the Unitrans

defendants have not provided proof thereof, as required by Local Rule 55.1 (see infra at 40-41),

nor does it appear that they ever moved for entry of default against Diamond. On July 23, 2009,

---

served on Diamond, but this Affidavit of Service demonstrates service of the "Crossclaim
Summons; Third Party Complaint of Defendant & Third Party Plaintiff," not the Answer with
Crossclaims asserted against Diamond. (Diamond/Futerman Default Judg. ¶ 1). Although the
Crossclaim Summons states that crossclaims have been brought against Diamond, it also
explicitly states in the Summons itself that it was served with the plaintiffs' Complaint and the
Third Party Complaint; the Answer with Crossclaims is not mentioned.

when the Unitrans defendants formally moved for Entry of Default against the third party

defendants, Futerman, STS Group, and Morozov, they failed to move for an Entry of Default

against Diamond.  Therefore, on September 15, 2009 and September 18, 2009, when the Clerk

entered default against the three third party defendants, no default was similarly entered against

Diamond.

On March 4, 2010, the Unitrans defendants filed a Motion for Default Judgment as to

both crossclaim defendant Diamond[34] and third party defendant Futerman, seeking a total of

$479,758.54 in damages.  As with the Answer with Crossclaims, the Court cannot find any

indication that this Motion for Default Judgment was ever served upon Diamond.  Furthermore,

this Motion for Default Judgment incorrectly asserts that default judgment is warranted, a

"default having been duly noted" against Diamond, when in fact no default had been previously

requested or entered.  (Diamond/Futerman Default Judg. ¶ 2).

Submitted at the same time as the Motion for Default Judgment is what appears to be a

proposed Order to be signed by the Clerk of Court, entitled "Notation of Default" against

Codefendant Diamond Shipping Group, Inc. and Third Party Defendant, Bronislav Futerman.

However, there is no accompanying motion requesting the Clerk to enter Default and there was

no indication made on the docket sheet by the Unitrans defendants upon filing this proposed

Order that it was attached to their Motion for Default Judgment.  Perhaps because there was no

Motion for Default filed, this Order was never signed or entered by the Clerk of Court.  This

document is curious for other reasons as well:  1) it includes Futerman, even though by the time

this document was filed, a Notation of Default had already been entered against Futerman; and 2)

---

[34]The Unitrans defendants seek default judgment against Diamond on Crossclaims 1-6.

the format and wording of this document is different than that previously used by the Unitrans

defendants when they officially requested the Entry of Default against the three third party

defendants, including Futerman, suggesting that this document was not meant to serve as a

formal motion for Entry of Default.

Also attached to the Motion for Default Judgment, but not indicated on the docket sheet,

is the Declaration of Joseph De May, Jr., Esq., in Support of Partial Default Judgment. This

declaration requests:

> A. Default judgment on the crossclaims and third party claims
> identified above; and
>
> B. That the default of the said defendant, Diamond Shipping
> Group, Inc., and third party defendant, Bronislav Futerman, be
> noted and that judgment against them be entered.

This attachment suffers from the same failings as the proposed Notation of Default Order.

Despite these hidden references to or requests for an entry of default against Diamond, no actual

motion for default was ever filed and no default was ever entered by the Clerk.


II. Plaintiffs' Claims Against Diamond

Plaintiffs Transatlantic and Bobr also seek default judgment against Diamond. On

August 30, 2010, plaintiffs Transatlantic and Bobr[35] filed "Letter to Hon. Cheryl L. Pollak," with

three Declarations attached thereto. The brief cover letter notes that one of the attached

documents is "a declaration of counsel supporting Plaintiffs' request for judgment against

---

[35]The claims of plaintiff Darg were dismissed pursuant to the July 27, 2010 Stipulation
and Order in which it was agreed that plaintiff's claims against defendants Unitrans, FT&T,
Lysogorsky, Cherkassky, Kaganov, and Farber (the "settling defendants") would be dismissed
with prejudice; and that on the counterclaims filed against Darg, defendants Unitrans and FT&T
would receive $32,300 without prejudgment interest.

Defaulting Defendant, Diamond Shipping Group, Inc." (Pls.' 8/30/10 Letter (emphasis added)). The cover letter does not, however, reference or request an entry of default, nor have plaintiffs Transatlantic and Bobr filed a more formal motion for the entry of default or default judgment; they merely request "that judgment on the papers submitted should be entered in favor of Transatlantic Auto Group, Inc. in the amount of $53,342.49, together with interest from December 16, 2008, and in favor of Bobr Export, Inc. in the amount of $29,675.03, together with interest from December 16, 2008." (Sucher Decl.[36] ¶ 9). Regardless, their request for default judgment against Diamond fails for various other reasons.

The Declaration for Inquest by Michael T. Sucher, Esq, which was referred to in the cover letter as supporting plaintiffs' request for default judgment, "respectfully request[s] that Diamond Shipping Group, Inc.'s default be noted pursuant to FRCP Rule 55." (Sucher Decl. ¶ 8). The Declaration also requests that judgment be entered in favor of plaintiffs. (Id. ¶ 9). As with the documents filed by the Unitrans defendants, no notice of motion was ever filed requesting entry of default and plaintiffs' request for an entry of default was buried in a manner not noticed or acted upon by the Clerk of the Court.[37] To their credit, however, plaintiffs did at least file an Affidavit of Service, on January 28, 2009, indicating that the Complaint, upon which they base their motion for default judgment, had been served upon defendant Diamond.

---

[36]Citations to "Sucher Decl." refer to the Declaration for Inquest By Michael T. Sucher, dated August 30, 2010.

[37]At the August 30, 2010 inquest hearing held by the Court, counsel for plaintiffs stated his intention to rely solely on his papers and chose not to present any witnesses.

III. Standards of Obtaining an Entry of Default and Default Judgment

The Local Rules for the Eastern District of New York provide as follows:

> A party applying for a certificate of default by the Clerk pursuant
> to Fed. R. Civ. P. 55(a) shall submit an affidavit showing (1) that
> the party against whom a notation of default is sought is not an
> infant, in the military, or an incompetent person; (2) that the party
> has failed to plead or otherwise defend the action; and (3) that the
> pleading to which no response has been made was properly served.

Local Civ. R. 55.1 (emphasis added).[38] Not only was no affidavit requesting entry of default

against Diamond ever properly or clearly filed by either the plaintiffs or the Unitrans

defendants,[39] but the Unitrans defendants have also failed to comply with the third requirement

listed above, by failing to provide an Affidavit of Service indicating that the Answer with

Crossclaims was properly served upon Diamond.

It is further specified in the Local Rules that when subsequently seeking a default

judgment, to be entered by the district court, "the party seeking a judgment by default shall apply

to the Court as described in Fed. R. Civ. P. 55(b)(2), and shall append to the application (1) the

Clerk's certificate of default, (2) a copy of the claim to which no response has been made, and (3)

a proposed form of default judgment." Local Civ. R. 55.2(b). Clearly, as no certificate of default

has been entered by the Clerk as to Diamond, neither defendants nor plaintiffs have been able to

comply with the first requirement of Local Rule 55.2(b). Moreover, compounding the due

process concern of adequate notice, neither party has indicated whether their motions for default

---

[38]Federal Rule of Civil Procedure 55 similarly provides that: "When a party against
whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that
failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ.
P. 55(a).

[39]As with the Affidavits of Service, the failure here is exacerbated by the fact that the
Unitrans defendants are clearly familiar with the proper method for requesting an Entry of
Default, having successfully done so for the three third party defendants.

40

judgment were ever served upon Diamond. Local Rule 55.2(c) requires that:

> Unless otherwise ordered by the Court, all papers submitted to the
> Court pursuant to Local Civil Rule 55.2(a) or (b) above shall
> simultaneously be mailed to the party against whom a default
> judgment is sought at the last known residence of such party (if an
> individual) or the last known business address of such party (if a
> person other than an individual). Proof of such mailing shall be
> filed with the Court. If the mailing is returned, a supplemental
> affidavit shall be filed with the Court setting forth that fact,
> together with the reason provided for return, if any.

Local Civ. R. 55.(c). The Committee note to Local Rule 55.2(c) indicates that the Committee

recommended the rule despite the fact that "Fed. R. Civ. P. 55(b) does not require service of

notice of an application for default judgment upon a party who has not appeared in the action"

because "experience has shown that mailing notice of such an application is conducive both to

fairness and efficiency."

In addition to the guidance provided by Local Rules for the Eastern District of New York,

the Second Circuit has also recently laid out the process for obtaining a default judgment

according to the Federal Rules: "Rule 55 of the Federal Rules of Civil Procedure provides a

two-step process for obtaining a default judgment. The first step is to obtain an entry of default .

. . . The next step requires the plaintiff to seek a judgment by default under Rule 55(b)."

Priestley v. Headminder, Inc., No. 09 CV 4931, 2011 WL 3190307, at *6 (2d Cir. July 28, 2011).

In another recent Second Circuit case, the court indicated that "[b]ecause Rule 55 contemplates a

'two-step process' beginning with entry of default under Rule 55(a), the City acted properly in

first seeking entry of default before moving for default judgment." City of New York v. Mickalis

Pawn Shop, LLC, 645 F.3d 114, 2011 WL 1663427, at *10, *13 n.20 (2d Cir. 2011) (citing New

York v. Green, 420 F.3d 99, 104 (2d Cir. 2005)).

41

In May of 2011, a district court in the Northern District of New York upheld the Magistrate Judge's denial of plaintiff's motion for default judgment, based on the fact that "plaintiff had failed to adhere to the two-step process for obtaining a default judgment under Fed. R. Civ. P. 55." Abuhouran v. United States, No. 9:04 CV 1023, 2011 WL 1793354, at *2 (N.D.N.Y. May 11, 2011). The district judge denied plaintiff's objections to the Magistrate Judge's recommendation, finding that the recommendation had "correctly reasoned it would be inappropriate to allow plaintiff to skip the two-step procedure for obtaining a default judgment." Id. at *2.

Similarly, in Monahan v. Pena, the court noted that "[t]here are two technical problems with plaintiff's assertion" that he is entitled to a default judgment, one of which was that "even if he had made a proper motion [for default judgment], he failed to seek entry of default from the Clerk of the Court prior to moving for default judgment, as is required by Rule 55(a) and Local Civil Rule 55.1 . . . . [T]hese technicalities alone would be sufficient to deny plaintiff relief to the extent he is actually seeking a cross-motion for default judgment." Monahan v. Pena, No. 08 CV 2258, 2009 WL 2579085, at *6 n.8 (E.D.N.Y. Aug. 18, 2009) (citing Meehan v. Snow, 652 F.2d 274, 276 (2d Cir. 1981) (noting that the first step in seeking default judgment is entry of default by clerk upon plaintiff's request); Eisenberg v. District Attorney of the County of Kings, 847 F. Supp. 1029, 1033 (E.D.N.Y. 1994) (holding that defendant "correctly points out that plaintiff's cross-motion is technically improper because plaintiff has not sought entry of default prior to moving for a default judgment as required by Fed.R.Civ.P. 55(a) and Local Civil Rule 10(b)," and that "this technicality alone supports denial of plaintiff's cross-motion")).

Some courts have held that it is permissible for both steps of the process to be requested

simultaneously, but an entry of default is still generally required before the entry of default judgment. See, e.g., La Barbera v. Federal Metal & Glass Corp., 666 F. Supp. 2d 341, 347 (E.D.N.Y. 2009). In La Barbera, the plaintiffs simultaneously submitted requests for both entry of default and default judgment. Later that day, the clerk of court entered the default. Id. Thus, the court held that "[a]lthough an application for entry of default should be made before a motion for entry of default judgment, courts will generally excuse a failure to obtain entry of default before the motion for default judgment is made." Id.

In Hannover Insurance Co. v. Hopwood, the plaintiff moved for entry of default in January of 2011, and in April of 2011, the court entered a default judgment against the defendant, even though no default had ever been noted by the Clerk of Court. No. 7:10 CV 8321, 2011 WL 3296081 (S.D.N.Y. May 26, 2011). In denying the defendant's motion to vacate the default judgment, the court noted that it was not clear if defendants had received notice that the court would enter a default judgment pursuant to Rule 55(b), in part because the motion for default under Rule 55(a) had never been acted upon, and in part because the judgment itself was prepared by the plaintiff without any indication that defendants had received notice or an opportunity to contest the requested damages. Id. at *2. However, in considering the three factors that instruct whether to vacate a default judgment, the court found that the defendants' failure to proffer a meritorious defense justified denial of the motion to vacate the default judgment. The court indicated that it was, nevertheless, quite "wary of upholding the default judgment," as "it is not clear that defendants received notice that the Court would enter a default judgment before it did so." Id. The court's concern underlines the importance of the two-step process in providing adequate notice of the potential default and the right to be heard.

One of the reasons for this delineated two-step process, "begin[ning] with the entry of a default by the clerk upon a plaintiff's request," is that "the defendant [then] has an opportunity to seek to have the default set aside." Meehan v. Snow, 652 F.2d at 276. In certain circumstances, this "omission of the entry of a default [may be considered] largely technical because the hearing on the appellees' motion for the entry of a default judgment afforded the appellants the same opportunity to present mitigating circumstances that they would have had if a default had been entered and they had then moved under Rule 55(c) to set it aside." Id. However, this conclusion does not apply to the present case because, as already noted, the Court has not been provided with proof that Diamond was ever served with the documents necessary to put Diamond on notice of the claims against it or that its rights were being adjudicated at the inquest hearing held by the Court.

Given that the Federal Rules of Civil Procedure clearly provide for "a two step-process for obtaining a default judgement," this Court declines to recommend that default enter against Diamond at this time. The case law is clear that "a party seeking a default judgment must obtain a default by bringing to the court's attention the fact that the party against whom affirmative relief is sought has failed to appear or to otherwise defend the action." Granite Music Corp. v. Center Street Smoke House, Inc., No. 09 CV 872A, 2011 WL 1898909, at *5 (W.D.N.Y. May 19, 2011) (noting that having filed their Request for Entry of Default, the plaintiffs had "completed the first step to obtain a default judgment") (citing New York v. Green, 420 F.3d at 104; Pinaud v. County of Suffolk, 52 F.3d 1139, 1157 n.11 (2d Cir. 1995)) (emphasis added); see also Enron Oil Corp. v. Diakuhara, 10 F.3d at 95-96 (setting out the two-step process for entry of a default judgment). Thus, "an entry of default is a prerequisite to a default judgment under Rule

55(b)." Engineers Joint Welfare, Pension, Supplemental Unemployment Ben. and Training Funds v. B.B.L. Constructors, Inc., 825 F. Supp. 13, 16 (N.D.N.Y. 1993). Both the Unitrans defendants and the plaintiffs here have failed to comply with the requirements necessary to properly secure an entry of default from the Clerk of Court against defendant Diamond.

Therefore, having failed to properly request and obtain an entry of default as to defendant Diamond, the Court respectfully recommends that both the plaintiffs' and the Unitrans defendants' motions for default judgment against defendant Diamond be denied, without prejudice, at this time.

## CONCLUSION

In conclusion, the Court respectfully recommends that a default judgment be entered against third party defendant Futerman for Counts 2, 5 and 6 of the Third Party Complaint and that the Unitrans defendants be awarded: 1) $205,564.50 for Count 2; 4) $14,000 for Count 5; and $375 for Count 6, for a total of $219,939.50.[40]

Furthermore, the Court respectfully recommends that a default judgment be entered against third party defendants STS Group and Morozov, jointly and severally, for Counts 9 and 10 of the Third Party Complaint and that the Unitrans defendants be awarded: 1) $83,172 for Count 9; and 2) $8,599 for Count 10, for a total of $91,771.

The Court also respectfully recommends that, at this time: 1) interest not be awarded on any of the aforementioned claims; 2) default judgment not be entered against third party defendant Futerman on Counts 1, 3, 4 or 7 of the Third Party Complaint; 3) default judgment not

---

[40]The Court notes that the $76,943.09 in interest requested in the Vengrow Declaration amounts to 16% of the total $479,839.50 in damages awarded.

be entered against third party defendants STS and Morozov on Count 1 of the Third Party Complaint; and 4) default judgment not be entered against defendant Diamond on any of the claims alleged by plaintiffs or the Unitrans defendants.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.


**SO ORDERED.**
Dated: Brooklyn, New York
September 9, 2011

Cheryl L. Pollak
United States Magistrate Judge